**Joseph E. VOGLER, and Alaskan Independence Party, Appellants,**

v.

**Terry MILLER, Lieutenant Governor of the State of Alaska, Appellee.**

No. 6959.

Supreme Court of Alaska.

March 4, 1983.

---

Joseph W. Sheehan, Fairbanks, for appellants.

David T. LeBlond, Asst. Atty. Gen., Anchorage, Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

### I

In *Vogler v. Miller*, 651 P.2d 1 (Alaska 1982) we held that it is unconstitutional for the state to require independents and small party candidates to submit petitions carrying signatures equal in number to at least 3% of the votes cast in the preceding general election in order to obtain a place on the gubernatorial ballot. That opinion was issued on an expedited basis in light of the then pressing need to print ballots. We now address the issue left undecided there: whether the eligibility of a party to nominate a candidate for governor through a primary election may constitutionally be conditioned on that party's receipt of 10% of the votes cast in the preceding gubernatorial election.

The relevant facts and proceedings in this case were recited in our earlier opinion, and hence need only be briefly summarized here. Joseph Vogler was the gubernatorial candidate of the Alaskan Independence Party (hereinafter AIP) in the November, 1982 general elections. As previously stated, Mr. Vogler was placed on the ballot in that election through a decision by this court holding the 3% petition requirement of AS 15.25.160 unconstitutional.[1] However, that was not the only relief sought by Vogler and the AIP in their suit. They further sought declaratory and injunctive relief from a decision by the Lieutenant Governor's Office, Division of Elections, denying Vogler's application for a place on the August, 1982 primary election ballot. The suit challenged the definition of a political party, for purposes of eligibility to participate in a primary election, as a group which had polled 10% of the votes cast in the preceding gubernatorial election. Vogler and the AIP argued that such a definitional requirement was invalid under the free speech and equal protection clauses of the Alaska Constitution. The superior court rejected those arguments and this appeal followed.

### II

In our first opinion in this case, we observed that restrictions on ballot access implicate the fundamental rights of potential candidates and voters alike. We stated that the rights thus implicated are the right to vote and the right to associate freely in the pursuit of political beliefs, the infringement of which renders illusory even the most basic of other fundamental rights. *Id.* (quoting *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24, 31 (1968)). Because "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of [freedom of speech]," we held that the free speech guarantees of article I, section 5 of the Alaska Constitution require that the state bear the burden of showing that any restriction on ballot access is justified by compelling governmental interests.[2] *Id.* (quoting *Williams*

---

1. AS 15.25.160 provides:
   *Required number of signatures for statewide office.* Petitions for the nomination of candidates for the office of governor, lieutenant governor, United States senator and United States representative shall be signed by qualified voters of the state equal in number to at least three percent of the number of votes cast in the preceding general election. Candidates for the office of governor and lieutenant governor shall file jointly.

2. Alaska Const. art. I, § 5 provides:
   *Freedom of Speech.* Every person may freely speak, write, and publish on all sub-

*v. Rhodes,* 393 U.S. at 32, 89 S.Ct. at 11, 21 L.Ed.2d at 32 and citing *Messerli v. State,* 626 P.2d 81, 84 (Alaska 1980)). We further observed that application of this standard in ballot access cases requires an inquiry into whether less restrictive alternatives will adequately protect any asserted governmental interests. *Id.* at 5 (citing L. Tribe, American Constitutional Law § 13–20, at 781 (1978) and *Mickens v. City of Kodiak,* 640 P.2d 818, 822 (Alaska 1982)).

█ It is clear that the state must bear the same burdens in justifying the restrictions it has imposed on a political party's eligibility to nominate a candidate through a primary election. The 10% definitional requirement of AS 15.60.010(20) operates as a restriction on ballot access no less than did the 3% signature requirement we previously examined. The fact that the unconstitutional restrictions on ballot qualification through petition were eliminated by that decision is of no significance to our evaluation of restrictions on qualification through a primary election. The former means of ballot access is not a substitute for the latter, and the difficulty of qualifying through one route cannot be justified by the openness of the other.[3]

Further, there are consequences of failing to achieve "political party" status which disadvantage small parties and their candidates and thereby result in burdens on fundamental political rights even where access to the general election ballot is not unduly restricted.

First, a party's ability to nominate a candidate in a primary election has importance wholly apart from merely serving as a means of qualifying for the general election ballot. This is because primaries have considerable political value to those parties and candidates entitled to participate in them.

Theodore H. White has appraised the importance of the primary election as follows:

Primaries had already thus become, by 1972, one of the great drive engines of American politics—for a primary is a deed. All else in politics, except money, is words—comment, rhetoric, analysis, polls. But a primary is a fact. There is a hardness to such a fact, especially if the victory is a contested one. With the light of such an event, a candidate can compel attention, build votes, change minds. It is the underdog's classic route to power in America.

T. White, *The Making of the President 1972* at 71 (1973). While political organizations allowed to participate in Alaska's primaries receive intense media coverage of their platforms and candidates, the small party that must instead seek a place on the ballot through the petition process goes relatively unnoticed.

Second, failure to satisfy the 10% requirement hinders a small party candidate's ability to raise campaign funds. This financial disadvantage results from AS 15.13.070(a) which provides in relevant part:

No person or group, including but not limited to all political committees, businesses, corporations, and labor unions, may contribute to or expend more than $1,000 a year on behalf of or in opposition to the competing candidates for each elective office. Political parties and their subdivisions are not subject to the limitation prescribed in this subsection....

Thus, while "political parties," as defined by AS 15.60.010(20), may contribute or expend an unlimited amount of money toward or against a candidate's campaign, all others may not contribute or expend more than $1,000 per person or group. Given the im-

---

jects, being responsible for the abuse of that right.

**3.** In this regard we adopt the same approach for ballot access adjudications under the Alaska Constitution as that endorsed by the United States Supreme Court in *Storer v. Brown,* 415 U.S. 724, 745–46, 94 S.Ct. 1274, 1286–87, 39 L.Ed.2d 714, 732 (1974), reh'g denied, 417 U.S. 926, 94 S.Ct. 2635, 41 L.Ed.2d 230 (1974). See

also *American Party of Texas v. White,* 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), reh'g denied, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974) which implicitly applied this approach by evaluating the constitutionality of restrictions on independent candidates and those on minor parties separately. *See generally* Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1142–44 (1975).

portant role of money in political campaigns, these restrictions could likewise have a severe impact on fundamental political rights if they prevented small party candidates from amassing the resources necessary for an effective campaign. *See Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659, 690 (1976) (per curiam).

### III

The precise question thus presented is whether the 10% definitional requirement contained in AS 15.60.010(20) impinges on the rights to vote and associate freely to the least degree possible consistent with the achievement of any compelling state goals.

A member of a "political party" may obtain a place on the general election ballot for governor by filing a declaration of candidacy pursuant to AS 15.25.030, paying a $100.00 filing fee pursuant to AS 15.25.-050(a), and then winning a primary election.[4] AS 15.60.010(20) defines "political party" for these purposes:

> "political party" means a group of organized voters which represents a political program and which nominated a candidate for governor who received at least 10 percent of the total vote cast at the preceding general election for governor.

■ To justify this 10% requirement, the state claims that there is a valid state interest in promoting a two-party system in order to encourage compromise and political stability, and similarly, that there is a valid state interest in ensuring that public officials are elected by a majority of the voters. Limiting "political party" status to those organizations able to poll 10% of the

electorate would presumably further these goals. While such interests have been recognized as valid by the United States Supreme Court, *see Bullock v. Carter,* 405 U.S. 134, 145, 92 S.Ct. 849, 857, 31 L.Ed.2d 92, 100–01 (1972), the Court has also held that state election laws imposing undue burdens on placing small parties on the ballot may not be justified on these grounds. *See Williams v. Rhodes,* 393 U.S. at 31–32, 89 S.Ct. at 10–11, 21 L.Ed.2d at 32. Moreover, our prior decision was based partially on the position that, as a matter of policy, it would be undesireable to attempt to compress "[t]he range of political views in our society . . . into the platforms of only two parties." For these reasons, we hold that the 10% polling requirement may not be justified by these asserted state interests.

■ The state also asserts that the 10% requirement may be justified by the "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Quoting *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554, 562–63 (1971). We noted in our prior decision that ensuring a sufficient modicum of support is a legitimate concern. However, the state has not established that this interest could not have been served by a requirement substantially smaller than 10%. A great majority of states place polling requirements of 5% or less on a party's eligibility to nominate through a primary election.[5] Because the state has offered no

---

4. AS 15.25.100 states that the winner of a primary election is automatically entitled to a place on the general election ballot:

   *Placement of nominees on general election ballot.* The director shall place the name of the candidate receiving the highest number of votes for an office by a political party on the general election ballot.

5. See Developments in the Law—Elections, 88 Harv.L.Rev. 1111, 1121 n. 1 (1975) which gives a state-by-state breakdown of the polling percentages required for automatic ballot access as a political party candidate. That footnote

indicates that fourteen states require 5% of the vote, five states require 3% of the vote, seven states require 2% of the vote, six states require 1% of the vote, and Indiana requires 0.5% of the vote. The District of Columbia and New York are stated to require that a party poll 7,500 and 50,000 votes respectively. When combined with Mississippi and South Carolina, which do not determine status on the basis of votes received in the last election, this adds up to a total of 37 jurisdictions which do not require greater than 5% of the vote in order to achieve automatic ballot access.

explanation why Alaska's electoral process requires a greater limitation, we are unable to conclude that the 10% definitional requirement is the least restrictive alternative possible consistent with the achievement of these goals.[6]

The judgment of the superior court with respect to AS 15.60.010(20) is REVERSED.

RABINOWITZ, Justice, concurring, joined by BURKE, Chief Justice.

I concur with the result reached by the court that the 10% requirement for political party status set forth in AS 15.60.010(20) is unconstitutional under article I, section 5 of the Alaska Constitution. I agree that the state bears "the burden of showing that any restriction on ballot access is justified by compelling governmental interests." My differences with portions of the court's decision are as follows:

First, the primary statutory provision before the court in this aspect of the appeal is the definition of "political party" as "a group of organized voters which represents a political program and which nominated a candidate for governor who received at least 10 percent of the total vote cast at the preceding general election for governor." AS 15.60.010(20). The definition speaks in terms of ten percent of the prior vote, not five percent, two percent, or one percent. In the significant areas of political speech and ballot access, I think it is important for us to restrict our holdings to the precise question before us. I therefore do not join in the court's suggestion that a five percent requirement would pass constitutional muster because "[a] great majority of states place polling requirements of 5% or less on a party's eligibility to nominate through a primary election." A five percent cut off means different things in different states, and the constitutionality of any such restriction should be considered by this court after adoption by the legislature. Only at such a point would this court be capable of

properly evaluating the asserted state interests within the context of the then current political processes in Alaska.

Second, the court having articulated the constitutional requirement that the state bears the burden of demonstrating that any restriction upon ballot access is justified by compelling state interests, I think it is necessary to apply this test with appropriate rigor. The state's burden must be satisfied by a factual showing that conditions in Alaska present a real need for the restriction imposed. In the instant case, for example, the state recites that the ten percent requirement of AS 15.60.010(20) was designed to avoid problems of voter confusion, but presents no empirical evidence that such confusion is, or ever has been, a problem among Alaska voters. While one might agree that voter confusion could prove debilitating to the Alaska political process, in my view it is not sufficient for the state to assert theoretical possibilities, albeit undesirable ones, to justify incursions upon free speech rights protected by the Alaska Constitution. In my view there must be some demonstration that the danger of voter confusion is real in order for the state successfully to assert that it provides justification for ballot access restrictions.

I do not join in the court's intimation that the state could meet its burden of justifying a lower percentage definition of political party merely by citing the existence of arithmetically similar statutes in the other jurisdictions. Other states are different geographically from Alaska, have different voter populations, are governed by their own unique constitutional guarantees and have statutory patterns of election laws that may vary substantially from that in Alaska. Unexplained numbers cannot be used to inform this court of its constitutional responsibilities.

The rights and privileges afforded to "political parties," once defined, vary with the interrelationship of election statutes exist-

---

**6.** We are aware that in *Jenness v. Fortson,* 403 U.S. 431, 439–40, 91 S.Ct. 1970, 1974–75, 29 L.Ed.2d 554, 561 (1971), the United States Supreme Court impliedly endorsed Georgia's 20% polling requirement for achieving political party status. *See Breese v. Smith,* 501 P.2d 159, 167 (Alaska 1972).

ing in each state. In the present case, I would place particular reliance upon the interplay between AS 15.60.010(20), and AS 15.13.070(a), providing a limitation of $1,000 per year on contributions to a political campaign made by all entities except political parties. I agree with the court that the presence of this contribution ceiling, combined with its political party exception could have "a severe impact on fundamental political rights." The existence of AS 15.13.070(a) significantly increases the constitutional "stakes" riding upon the definition of "political party" selected by the legislature. The state's burden in justifying such a classification is correspondingly increased as it escalates the restrictions placed on rights of free speech.