STATE of Alaska, DIVISION OF ELEC-TIONS, and Laura Glaiser, Director of the Division of Elections, Petitioners,

v.

Ray METCALFE, Respondent.

No. S–11618.

Supreme Court of Alaska.

April 15, 2005.

Jan Hart DeYoung, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellant.

Ray Metcalfe, pro se, Anchorage, Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The superior court granted a preliminary injunction to a third-party political candidate based upon a claim of unconstitutionality of state ballot access laws. The injunction compelled the State of Alaska to include, despite the candidate's noncompliance with such laws, the candidate's name and party on the November 2004 general ballot for United States Senator. We heard the state's petition for review on an expedited basis in order to provide a ruling before the final ballot printing deadline. Because there was no clear showing of probable success on the constitutional claim, we issued an expedited order reversing the superior court and thereby vacating the preliminary injunction. This opinion explains the rationale behind that order.

## II. FACTS AND PROCEEDINGS

A political candidate seeking elected office in Alaska earns placement on a general ballot in one of two ways: (1) by submitting a nominating petition,[1] or (2) by winning the primary election of a recognized political party.[2] A nominating petition must contain signatures of eligible voters equal to one percent of the number of voters in the previous gubernatorial election, and it qualifies only that candidate for that given election.[3] In contrast, the winner of the primary election of a recognized political party automatically earns that party's spot on the general ballot.[4] A political group becomes a recognized "political party" when (1) its nominated candidate receives three percent of the vote in the prior gubernatorial election, or (2) it obtains party membership equal to three percent of the number of voters in the previous gubernatorial election.[5]

Ray Metcalfe is the chairman and founder of the Republican Moderate Party (RMP). In 1998 he obtained the necessary signatures to submit a nominating petition for his candidacy for governor. In that election, Metcalfe ran on behalf of the RMP though it was not yet a recognized political party. Metcalfe won over six percent of the vote; accordingly, the RMP earned official party status until at least the next gubernatorial election, in 2002.

1. See AS 15.25.140–.200.

2. *See* AS 15.25.010–.130.

3. AS 15.25.160.

4. AS 15.25.100.

5. Former AS 15.60.010(21). This statute was amended by ch. 50, § 9, SLA 2004, and the change took effect on November 3, 2004. As this case involves the November 2, 2004 election, the prior version of the statute applies.

In the 2000 and 2002 elections, the RMP's access to the primaries enabled it to field numerous candidates for the state legislature—one of whom was elected to the state senate—and for governor. In addition to the RMP, the Republican, Democratic, Alaska Independence, Libertarian, and Green Parties were officially recognized and fielded candidates in the November 2002 gubernatorial election. The RMP's candidate in that race polled only 0.65% of the total votes cast.

As a result of that performance, the state sent Metcalfe a letter on February 12, 2003, indicating that the RMP's vote result did not meet AS 15.60.010(21)'s three percent threshold for party recognition by way of earned votes. The letter also noted that the RMP's membership of 3,151 registered voters (roughly 1.36% of the votes cast for governor in the 2002 election) was below the 6,945 voters (three percent of the votes cast for governor) required to secure recognition based on membership. Accordingly, the letter revoked the RMP's status and stated that re-application would be necessary. Metcalfe re-applied on June 27, 2003. However, by the July 7, 2004 deadline, the RMP's membership remained well below the requisite amount, so Metcalfe's application was not accepted. Metcalfe had also filed a notice of a nominating petition on May 24, 2004. He was told to submit the signatures of 2,329 registered voters (one percent of total votes cast for governor) by August 24 to qualify as a candidate for the general election. Metcalfe did not submit any signatures to the state.

On July 13, 2004, Metcalfe filed a complaint and request for a preliminary injunction. The briefing schedule was expedited due to the impending election, and the superior court heard oral arguments on August 9. On August 13, Judge Christen held that Metcalfe had demonstrated a "probability of success on the merits" on his claim that the statutory requirements for recognition as a political party were unconstitutional. The superior court issued a preliminary injunction and ordered the state to place Metcalfe's name on the general election ballot as the RMP candidate for the U.S. Senate.

The state filed a petition for review. Before the ballot printing deadline, we heard oral arguments and issued an order on September 14, reversing the superior court's order and vacating the preliminary injunction, noting that this opinion would follow.

## III. STANDARD OF REVIEW

■ We review an order granting a preliminary injunction under the abuse of discretion standard.[6]

## IV. DISCUSSION

### Metcalfe Failed To Demonstrate Probable Success on the Merits of His Constitutional Claim.

■ The showing required to obtain a preliminary injunction depends on the nature of the threatened injury. If the plaintiff faces the danger of "irreparable harm" and if the opposing party is adequately protected, then we apply a "balance of hardships" approach in which the plaintiff "must raise 'serious' and substantial questions going to the merits of the case; that is, the issues raised cannot be 'frivolous or obviously without merit.'"[7] If, however, the plaintiff's threatened harm is less than irreparable or if the opposing party cannot be adequately protected, then we demand of the plaintiff the heightened standard of a "clear showing of probable success on the merits."[8]

■ We apply the latter test in this instance. Even assuming that Metcalfe faced "irreparable injury,"[9] we see simply no way for the state's interests to be adequately protected. We have said that such protection exists where "the injury that will result from the injunction can be indemnified by a

---

6. *State v. Kluti Kaah Native Vill. of Copper Ctr.*, 831 P.2d 1270, 1272 n. 4 (Alaska 1992).

7. *Id.* at 1273 (citations omitted).

8. *Id.* at 1272 (quoting *A.J. Indus., Inc. v. Alaska Pub. Serv. Comm'n*, 470 P.2d 537, 540 (Alaska

1970), *modified in other respects*, 483 P.2d 198 (Alaska 1971)).

9. Because we find that the state's interests cannot be adequately protected, we need not determine the nature of the harm plaintiff stands to suffer.

bond or where it is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted."[10] Here, a preliminary injunction will prevent the state from administering an election pursuant to its own election laws. As discussed below, these laws exist to further a legitimate state goal—to require a political group to first demonstrate some political support before compelling the state to recognize it as a political party and bestow upon it the benefits concomitant with recognition. This interest cannot be guaranteed by a bond, nor is it slight when compared with Metcalfe's interests; issuance of this injunction is a zero-sum event, where one party will invariably see unmitigated harm to its interests. Accordingly, we require Metcalfe to demonstrate a clear showing of probable success on the merits.[11]

■ Metcalfe claims that the three percent requirement set by AS 15.60.010(21) for recognition as a political party is an unconstitutional infringement on ballot access,[12] violating the free speech and equal protection provisions of the Alaska Constitution.[13]

■ We have recognized that restrictions on ballot access interfere with the rights of candidates *and* voters.[14] At least two fundamental rights are implicated—the right to vote and the right to associate freely in pursuit of political beliefs.[15] We have noted the importance of competition in the political marketplace, and that "[n]ew parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have done in the past."[16]

■ In light of these considerations, we review ballot access restrictions with strict scrutiny.[17] First, we require the state to show a compelling interest in order to justify infringements of these rights.[18] Second, we inquire into whether less restrictive alternatives would have adequately protected the asserted governmental interests.[19] In the context of ballot access cases, strict scrutiny leaves more room for a finding of constitutionality. As the Ninth Circuit stated, "unlike other areas in which strict scrutiny has been employed, its invocation in election law cases has not preordained their outcome. In fact, the [Supreme] Court has repeatedly

---

10. *State v. United Cook Inlet Drift Ass'n,* 815 P.2d 378, 378–79 (Alaska 1991).

11. The superior court erroneously concluded that the state's interests could be adequately protected merely because the dispute could be resolved before the general election ballots were to be printed. This conclusion ignores the state's interest in the consistent administration of elections according to a considered statutory scheme. Thus, the superior court wrongly noted that the plaintiff need only prevail under the "balancing of hardships" test. It went on, however, to hold that Metcalfe would also prevail under the "probable success" test. Because we find no legal basis for this conclusion, as explained below, we reverse.

12. Metcalfe also argues that the recent amendment to these ballot access requirements, *see* ch. 50, § 9, SLA 2004 (effective date Nov. 3, 2004), is unconstitutional. Because this amendment was not effective at the time of this suit—and would not be effective until after the November election—Metcalfe was not affected by its provisions, and we decline to pass on its constitutionality.

13. Freedom of speech is protected by Article I, section 5 of the Alaska Constitution, which is at least as broad as the First Amendment to the United States Constitution. *Mickens v. City of*

*Kodiak,* 640 P.2d 818, 820 (Alaska 1982). Equal protection is guaranteed by Article I, section 1 of the Alaska Constitution, which we have interpreted in some instances as broader than its federal counterpart. *See State v. Anthony,* 810 P.2d 155, 157 (Alaska 1991); *State v. Erickson,* 574 P.2d 1, 11–12 (Alaska 1978). Presumably because the United States Supreme Court has upheld more restrictive statutes under federal law, *Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), Metcalfe only argues infringements of rights protected by the Alaska Constitution.

14. *Vogler v. Miller,* 651 P.2d 1, 3 (Alaska 1982) *(Vogler I )*.

15. *Id.*

16. *Id.* (quoting *Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)).

17. *See generally Sonneman v. State,* 969 P.2d 632, 638 (Alaska 1998); *see also Vogler I,* 651 P.2d at 4.

18. *Vogler v. Miller,* 660 P.2d 1192, 1193 (Alaska 1983) *(Vogler II )*.

19. *Id.* at 1194.

stressed that there is no 'litmus-paper test' for evaluating constitutional challenges to ballot-access restrictions." [20] We also note that a duly-enacted statute is entitled to a presumption of constitutionality.[21] Thus, the language of heightened scrutiny guides our analysis; it does not sound a death knell for the state.

The seminal Alaska ballot access opinions are the *Vogler* cases. Those cases were in response to a similar constitutional challenge by a third-party gubernatorial candidate against then-effective ballot access laws. In *Vogler I*, we struck down as unconstitutional a statute that required nominating petitions to contain signatures totaling at least three percent of the total votes cast in the previous election.[22] This figure seemed especially burdensome in light of the fact that the state had until recently required only one thousand signatures; this statutory change reflected nearly a five-fold increase on the old requirement.[23] We suggested that a figure of one percent—roughly equivalent to the old requirement—was less burdensome, and held the three percent figure unconstitutional under the test above.[24] The legislature subsequently placed the requirement for nominating petitions at one percent.[25]

*Vogler II* presented essentially the same constitutional challenge brought by Metcalfe. That challenge was based on the former version of AS 15.60.010(21), which required obtaining ten percent of the votes cast in order to be recognized.[26] Though this court split in its rationale, we unanimously held this figure to be unconstitutional.[27] We first noted the interests at stake in denying some political

groups official recognition: diminished political capital by not being able to participate in the primary election and limited ability to raise funds under the campaign finance laws.[28] We then noted the countervailing state interest in regulating ballot access: to require "some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot." [29] This is an interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election." [30] We found this interest sufficiently important under the constitutional test.[31] The plurality nevertheless struck down the law, noting that a "great majority of states" place polling requirements for parties at "5% or less" and that the state offered no explanation why Alaska's requirement should be substantially more burdensome.[32] The legislature subsequently placed the requirement at its present level of three percent.[33]

We view this analysis—comparing Alaska's ballot-access requirements with the requirements of other states—as one reasonable way to determine whether less restrictive alternatives exist. As the state here has shown a compelling interest in requiring potential political parties to demonstrate a "significant modicum of support," as it did in the *Vogler* cases, we turn to the question of whether less restrictive alternatives to the current three percent barrier exist.

We begin by noting the difficulty of this analysis when the statute establishes a numerical line, because it is always theoretically possible to say that a requirement of "one

20. *Lightfoot v. Eu*, 964 F.2d 865, 869 (9th Cir. 1992) (citations omitted).

21. *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001).

22. *Vogler I*, 651 P.2d at 6.

23. *Id.* at 2, 5.

24. *Id.* at 5–6.

25. *See* AS 15.25.160, as amended by ch. 85, § 26, SLA 1986.

26. *Vogler II*, 660 P.2d at 1193.

27. *Id.* at 1196.

28. *Id.* at 1194–95, 1196–97 (Rabinowitz, J., concurring).

29. *Id.* at 1195 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971)).

30. *Id.*

31. *Id.; see also Vogler I*, 651 P.2d at 4.

32. *Vogler II*, 660 P.2d at 1195–96.

33. *See* former AS 15.60.010(21) as amended by ch. 85, § 44, SLA 1986.

less" (even one less *voter*) is "less restrictive." But line-drawing always involves close cases at the margins, and we cannot quantify with mathematical precision where the constitutional line is to be found. We are guided by *O'Callaghan v. State*,[34] which accorded deference to the legislature in making election decisions. There, we noted that the state need not put forth "a particularized showing" in defending the interests underlying its election laws:

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshalled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.[35]

Thus, we paraphrase our inquiry: Did the legislature act reasonably in determining that three percent of the voters in the previous election is the lowest appropriate standard to determine that a group has a "significant modicum of support"?

In light of the deference we accord to the legislature on such issues, and because the three percent figure remains in the mainstream of the practices of other states,[36] Metcalfe has failed to demonstrate that he is entitled to a preliminary injunction based on a "clear probability of success on the merits." Nor can we discern any valid legal ground in the superior court's opinion leading to the conclusion that the legislature acted unreasonably in enacting a three percent polling requirement.

The superior court, relying on Metcalfe's arguments, put forth two grounds to suggest that the legislature's requirement was unreasonable. The first focuses on the relationship between the "three percent" polling or membership requirement for political parties and the "one percent" signature requirement for individual candidates' nominating petitions. We implicitly found this latter requirement to be constitutional in *Vogler I*.[37] The superior court viewed these differing levels of needed support as an unexplained "discrepancy." In other words, if one percent was sufficient to protect the state's interests *vis-a-vis* individual candidates, then one percent should also be sufficient to protect the state's interests *vis-a-vis* political parties. Although the state justified the difference by showing that the designation "political party" carries additional ramifications beyond one-time access to a general ballot, the superior court dismissed this showing as "insufficient." We cannot agree.

We find sufficient differences between the purposes and the effects of the two procedures to warrant differing showings of support. Implicit in the two *Vogler* opinions is the conclusion that these processes are not equivalent and that each is governed by its own inquiry—after all, we separated the inquiries into two opinions and indicated no concern that the law demanded a higher showing of support for a political party than for an individual candidate. Today we make this conclusion explicit. A nominating petition results in the placement of one candidate on one general ballot. In contrast, the recognition of a political party has lasting implications—that party, among other things, obtains increased powers under the campaign-finance laws,[38] gains access to primary elec-

34. 914 P.2d 1250 (Alaska 1996).

35. *Id.* at 1254 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)).

36. Metcalfe concedes that at least twenty-two other states presently place a polling requirement at three percent or higher. Moreover, we are aware of no case from another jurisdiction holding a polling requirement for political party recognition equal to or less than three percent unconstitutional.

37. 651 P.2d at 5.

38. *See* AS 15.13.070.

tions,[39] and earns automatic placement on general election ballots (permitting it to freely field slates of candidates for several years).[40] It seems entirely reasonable, in light of these benefits, for the state to demand more from a political party than an individual candidate. Its interests in requiring a "substantial modicum" of support are incrementally more threatened by a new recognized party than by a new individual candidate. We therefore conclude that this difference between the requirements for ballot access for individuals and parties is not a valid ground upon which to find that the legislature acted unreasonably in demanding three percent from parties.

The superior court's second reason for finding the legislature's three percent requirement unreasonable was based on fairness. The court found it unfair that an "affiliated" candidate, whose party must meet the three percent threshold, faces a greater burden than an "unaffiliated" candidate, who need only submit a nominating petition that meets the one percent requirement. But the three percent requirement does not apply to an "affiliated" candidate—it applies to his or her would-be political party. If the party fails to qualify, the option of filing a nominating petition continues to be available, just as it is for an "unaffiliated" candidate. Thus, we cannot agree that "affiliated" candidates are disadvantaged when compared with "unaffiliated" candidates.

Because Metcalfe failed to show that the legislature acted unreasonably in setting a three percent requirement for political party status, he failed to establish a clear probability of success on the merits of his claim. Thus, he was not entitled to a preliminary injunction.[41]

39. *See* AS 15.25.010–.130.

40. *See* AS 15.25.100.

41. The superior court also noted that the legislature defined "political party" more expansively in campaign finance laws than in ballot access laws. *See* former AS 15.13.070. Whatever support this discrepancy might lend to Metcalfe's

## V. CONCLUSION

For these reasons, we REVERSED the order of the superior court and VACATED the issuance of the preliminary injunction.

argument, we ignore it because the analysis is outmoded—prior to this action, the legislature eliminated this discrepancy by amending the campaign-finance laws to incorporate the ballot-access definition. *See* ch. 108, §§ 18, 19, SLA 2003 (effective Sept. 14, 2003). Thus, the RMP did not qualify as a political party under any standard in Alaska.