The **GREEN PARTY OF ALASKA,** Appellant,

v.

**STATE of Alaska, DIVISION OF ELECTIONS, and Janet Kowalski, Director,** Appellees.

No. S–11964.

Supreme Court of Alaska.

Nov. 17, 2006.

Kevin M. Morford, Chugiak, for Appellant.

Sarah J. Felix, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellees.

Jason Brandeis, ACLU of Alaska Foundation, Anchorage, for Amicus Curiae.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

The Green Party of Alaska challenged the constitutionality of a statute that set out the threshold requirements for recognition of a group as a political party for election purposes. Former Alaska Statute 15.60.010(21) required a group to attain at least three percent of the votes polled in the last gubernatorial election, or to register the equivalent number of voters. In 2002 the Green Party failed to garner three percent of the vote in the governor's race but it did poll over six percent of the vote in two other statewide elections. The Division of Elections subsequently withdrew recognition of the Green Party as a political party. The Green Party alleged that, in so doing, the Division of Elections unconstitutionally infringed on its freedoms of speech and political association and its right to equal protection of the laws. The superior court granted summary judgment to the state. Because the state has a clear and legitimate interest in regulating ballot access, and because it did so in a way that did not unfairly burden the constitutional rights of Green Party voters or candidates, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

The Green Party of Alaska is an organized group of voters which has regularly engaged in political and electoral activities in Alaska since its inception in 1990. The Green Party has consistently run statewide candidates in Alaska. In the 2002 general election, the Green Party ran candidates for four state-wide offices: Governor and Lieutenant Governor, United States Senator, and United States Representative. In the race for United States Senator the Green Party garnered 7.24 percent of the total votes cast in that race (16,608 of 229,548). In the United States Representative race the Green Party received 6.34 percent of the total votes cast in that race (14,435 of 227,725). However, in the race for Governor and Lieutenant Governor the Green Party received only 1.26 percent of the votes cast (2,926 of 231,484).

The Division of Elections concluded that the Green Party failed to retain recognized political party status because it did not meet the statutory requirements for recognition. Alaska Statute 15.60.010(21)—the governing statute at the time—defined a "political party" as:

> [A]n organized group of voters that represents a political program and that either nominated a candidate for governor who received at least three percent of the total

votes cast for governor at the preceding general election or has registered voters in the state equal to at least three percent of the total votes cast for governor at the preceding general election.[1]

It is uncontroverted that the Green Party's gubernatorial candidate received 2,926 votes, or 1.26 percent, of the total votes cast for governor in the 2002 general election. It is also uncontested that by February 2003 there were 4,768 registered voters in the Green Party of Alaska, representing approximately two percent of the total votes cast for governor in the 2002 general election. Because the Green Party did not poll three percent of the total vote in the 2002 election, nor did the Green Party register three percent of the vote for governor, the Division of Elections withdrew recognition of the Green Party as a political party.

As a result of this change in the Green Party's status, Green Party candidates would not be allowed to appear on the 2004 primary election ballot unless they first gathered sufficient signatures on a petition, pursuant to AS 15.25.140–.200. In addition, the Green Party's ability to collect and distribute campaign contributions would be impaired because contributions to political groups are more strictly limited than contributions to political parties.[2]

---

1. AS 15.60.010(21), defining "political party," was amended by ch. 50, § 9, SLA 2004 and now appears as AS 15.60.010(23). The new statute defines a "political party" as:

   An organized group of voters that represents a political program and
   (A) that nominated a candidate for governor who received at least three percent of the total votes cast for governor at the preceding election or has registered voters in the state equal in number to at least three percent of the total votes cast for governor at the preceding general election;
   (B) if the office of governor was not on the ballot at the preceding general election but the office of United States senator was on that ballot, that nominated a candidate for United States senator who received at least three percent of the total votes cast for United States senator at that general election or has registered voters in the state equal in number to at least three percent of the total votes cast for United States senator at that general election; or

   (C) if neither the office of governor nor the office of United States senator was on the ballot at the preceding general election, that nominated a candidate for United States representative who received at least three percent of the total votes cast for United States representative at that general election or has registered voters in the state equal in number to at least three percent of the total votes cast for United States representative at that general election.
   We note that in this case we address only the constitutionality of former AS 15.60.010(21). We make no comment regarding the current statute.

2. A group that is not a political party may contribute not more than $2,000 per year to a candidate for any office. AS 15.13.070(c)(1). In contrast, a political party may contribute $100,000 per year to a candidate for governor or lieutenant governor, $15,000 per year to a candidate for state senate, and $10,000 per year for a candidate to the state house of representatives. AS 15.13.070(d)(1)-(3).

The Green Party acknowledges that it did not satisfy the statutory requirements for recognition as a political party. However, it challenges the statute as unconstitutional, claiming that the state, by limiting the qualifying contest to the governor's race while ignoring other statewide races, violated the Green Party's rights to equal protection, free speech, free political association, and ballot access. While the Green Party concedes that the state has a legitimate interest in ensuring that a political group be able to demonstrate a significant modicum of support before enjoying the benefits of political party status,[3] it argues that a group that garners at least three percent of the total vote for any statewide office has met that requirement.

## B. Proceedings

The Green Party sought a declaratory judgment that the Division of Elections violated the Party's constitutional rights by depriving it of its status as a political party. In 2003 Superior Court Judge John Reese granted the Green Party a preliminary injunction enjoining the state from withdrawing recognition of the Party's political party status. Taking a balancing of hardships approach, Judge Reese found that withdrawing political party status would irreparably harm the Green Party because it would be precluded from participating in the 2004 primary election, and because its fund-raising ability would be significantly limited. Judge Reese also concluded that the state's interest in avoiding an overcrowded and confusing ballot would not be harmed by the preliminary injunction because the Green Party had appeared on ballots over the past decade, and it had obtained over six percent of the votes in the most recent statewide elections for federal office. Finally, Judge Reese found that the Green Party raised a serious and substantial question as to the constitutionality of AS 15.60.010(21).

In June 2004 the state requested that the preliminary injunction be dissolved because the legislature had amended AS 15.60.010(21) and enacted a new definition of "political party."[4] Judge Reese denied the state's request, and the preliminary injunction remained in force. As a result of the preliminary injunction, Green Party candidates were able to participate in the August 2004 primary election. These candidates also appeared on the general election ballot in November 2004. The Green Party's candidates for United States Senator and United States Representative polled 0.99 percent and 3.81 percent respectively in the 2004 general election. (There was no gubernatorial election that year.)

In August 2004 the Green Party moved for summary judgment in the form of a declaratory judgment against the state,[5] claiming that the state had "violated the fundamental constitutional rights of the Green Party of Alaska, and violated its right to equal protection of the laws" by withdrawing recognition of its status as a political party. The motion for summary judgment was presented to Superior Court Judge Craig F. Stowers.

At around the same time, another Anchorage superior court issued a preliminary injunction in a similar case, ordering the state to place Ray Metcalfe's name on the ballot as a Republican Moderate Party candidate for United States Senate in the November 2004 election. In that case, Metcalfe challenged the requirement that a political group receive at least three percent of the vote to achieve political party status. In *State, Division of Elections v. Metcalfe*[6] we reversed that order and vacated the preliminary injunction, holding:

> In light of the deference we accord to the legislature on such issues, and because the three percent figure remains in the mainstream of the practices of other states, Metcalfe has failed to demonstrate that he is entitled to a preliminary injunction

**3.** See *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 980 (Alaska 2005).

**4.** See note 1, *supra*.

**5.** The Green Party expressly noted that, because the future status of the party was uncertain, it

did not seek an award of a permanent injunction, but rather only wanted a declaratory judgment regarding the legal effect of the past conduct of the state.

**6.** 110 P.3d 976 (Alaska 2005).

based on a "clear probability of success on the merits." [7]

The Green Party's summary judgment motion had been held in abeyance until we published the *Metcalfe* decision. Judge Stowers noted that he "ha[d] been awaiting that opinion in the event the Supreme Court's decision might be pertinent to the Green Party case." Ultimately, Judge Stowers found *Metcalfe* not only pertinent, but dispositive. As he explained, Judge Reese, like the superior court in *Metcalfe*, had used a balancing of hardships approach rather than requiring the plaintiff to demonstrate a clear showing of probable success on the merits.

Judge Stowers concluded that the Green Party, like Metcalfe, had failed to demonstrate probable success on the merits. Judge Stowers also held that, while there are less restrictive alternatives to the statute's reliance on the gubernatorial race as the benchmark, "this court cannot say that the legislature's use of the gubernatorial election as the benchmark for the three percent threshold ... was unreasonable." Finally, Judge Stowers found that Alaska's approach was within the mainstream of other states. In sum, Judge Stowers concluded that:

> [b]ecause the Green Party has failed to show that the legislature acted unreasonably in selecting the office of governor as the touchstone for gauging that necessary and sufficient minimum modicum of public support for defining a political party under former AS 15.60.010(21), it failed to establish a clear probability of success on the merits, and it also failed to prove that former AS 15.60.010(21) is unconstitutional.

Consequently, the Green Party's motion for summary judgment was denied, and the state's cross-motion was granted.

The Green Party now appeals. Both parties agree that there are no genuine issues of material fact, and that we can decide the dispute as a matter of law.

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment *de novo* and will affirm if, when the facts are viewed in the light most favorable to the party that lost below, there are no genuine issues of material fact and the party that won below is entitled to judgment as a matter of law.[8]

■ Constitutional claims are questions of law, and consequently are reviewed *de novo*.[9] In conducting a *de novo* review, we adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[10]

## IV. DISCUSSION

### A. The Legal Claims in this Suit Have Not Been Rendered Moot.

■ As a preliminary matter, the Green Party argues that its claims have not been rendered moot, despite the fact that the legislature has since amended the challenged statutory provisions. The state does not contest the justiciability of this case, indicating in a footnote that, while the issues raised may arguably be moot, the Division of Elections does not oppose the court's consideration and resolution of the claim now.

■ Mootness functions as a doctrine of judicial restraint; we generally refrain from deciding questions where events have rendered the legal issue moot.[11] A case is moot if "it has lost its character as a present, live controversy." [12] As we stated in *Kodiak Seafood Processors Association v. State*, "Mootness is particularly important in a case seeking a declaratory judgment." [13] We must be particularly careful to ensure that the controversy is " 'definite and concrete,

---

7. *Id.* at 981.

8. *Sonneman v. State*, 969 P.2d 632, 635 (Alaska 1998).

9. *Id.* at 636.

10. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

11. *See, e.g., Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1195 (Alaska 1995).

12. *Id.*

13. *Id.*

touching the legal relations of parties having adverse legal interests.' " [14]

The doctrine of mootness is inapplicable in the present case. Although the legislature adopted a new definition of "political party" in its amendments to AS 15.60.010(21), the state acknowledges that the governor's office will again be the touchstone office for the elections in 2007 and 2008. Thus, the legal controversy presented remains alive despite the change in definition.

## B. The Superior Court Did Not Err in Concluding that Former AS 15.60.010(21) Was Constitutional.

■ The Green Party argues that former AS 15.60.010(21) unconstitutionally infringed upon the rights of Green Party voters and candidates.

■ We have acknowledged that ballot access restrictions interfere with the right to vote and the right to associate freely in the pursuit of political beliefs.[15] A political group that has been denied party status suffers "diminished political capital by not being able to participate in the primary election and limited ability to raise funds under campaign finance laws." [16] As a result, we review ballot access restrictions with strict scrutiny.[17]

Yet strict scrutiny in this context does not automatically void statutory restrictions on ballot access.[18] In *State v. Green Party of Alaska*[19] we adopted the United States Supreme Court's approach to ballot access cases, in which the Court "has stressed the importance of protecting the right to participate in the political process, [while] also recogniz[ing] that in order to ensure that elections are orderly and fair, government must play an active role in structuring elections." [20]

■ To determine whether ballot access restrictions unconstitutionally burden the rights of candidates and voters, we conduct "a careful balancing of the importance and necessity of the election law against the infringement of constitutionally protected rights," [21] applying a four-step balancing approach:

> When an election law is challenged the court must first determine whether the claimant has in fact asserted a constitutionally protected right. If so we must then assess the character and magnitude of the asserted injury to the rights. Next we weigh the precise interests put forward by the state as justifications for the burden imposed by its rule. Finally, we judge the fit between the challenged legislation and the state's interests in order to determine the extent to which those interests make it necessary to burden the plaintiff's rights.[22]

The analysis is intended to be flexible: "[A]s the burden on constitutionally protected rights becomes more severe, the government interest must be more compelling and the fit between the challenged legislation and the state's interests must be closer." [23] To determine whether AS 15.60.010(21) unconstitutionally burdened the Green Party's fundamental rights, we now address each prong of the balancing test.

## 1. The Green Party has asserted a constitutionally protected right.

The Green Party asserts that AS 15.60.010(21) violates its constitutionally protected rights to equal protection, freedom of

14. *Id.* (quoting *Jefferson v. Asplund,* 458 P.2d 995, 999 (Alaska 1969)).

15. *State, Div. of Elections v. Metcalfe,* 110 P.3d 976, 979 (Alaska 2005).

16. *Id.* at 980.

17. *Id.* at 979.

18. *See id.* at 980, holding that "[i]n the context of ballot access cases, strict scrutiny leaves more room for a finding of constitutionality."

19. 118 P.3d 1054 (Alaska 2005).

20. *Id.* at 1059.

21. *Id.* at 1060.

22. *Id.* at 1061 (citations and quotation marks omitted).

23. *Id.*

political association, freedom of speech, and the fundamental right to vote.[24]

We have recognized that ballot access restrictions impinge on the fundamental rights of potential candidates and on the rights of voters: "laws restricting ballot access 'place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.' "[25] Thus, the Green Party has asserted injury to its constitutionally protected rights.

### 2. The Green Party has overstated the magnitude of its injury.

The Green Party argues that the state's actions have resulted in a "total deprivation of important constitutional rights." The Party contends that the state, by "stripping" it of its status as a political party, has precluded it from placing candidates on the primary ballot.

The Green Party overstates its argument. Although its ability to place candidates on the ballot is impeded by the statute's limiting requirements, it has not been totally deprived of the opportunity. Besides obtaining at least three percent of the vote in the previous gubernatorial election[26]—the method challenged by the Green Party—a political organization has two other options. It may register voters equivalent to at least three percent of the vote in the previous gubernatorial election.[27] Alternatively, a political or-

ganization may nominate a candidate by petition.[28] It appears that the Green Party did not take advantage of either of the latter two options. Thus, while it makes a valid argument that its rights have been impeded, it overstates the magnitude of the injury.

### 3. The state has offered compelling interests to justify the burden imposed by the statute.

■■ In analyzing the state's ability to regulate elections, we "balanc[e] ... the importance and necessity of the election law against the infringement of constitutionally protected rights."[29] The state bears the burden of proving that it has a compelling interest to justify infringing on the rights of free speech, political association, and equal protection.[30]

The Green Party maintains that the state's sole justification for the statute in question is to avoid cluttered ballots by excluding those political groups that have not demonstrated a significant modicum of support among voters. While acknowledging that this is a legitimate goal, the Green Party contends that the goal is not advanced by the challenged statute.

We previously found that the state had a compelling interest in "requiring potential political parties to demonstrate a 'significant modicum of support.' "[31] We held then, as we hold today, that the state's interest in requiring a "significant modicum of support" is compelling because it helps the state "avoid[ ] confusion, deception, and even frustration of the democratic process at the general election."[32] Accordingly, the state's interest

**24.** In *Sonneman v. State*, 969 P.2d 632, 636–37 (Alaska 1998), we determined that the impact of eligibility restrictions on candidates and voters should be analyzed directly under the right to vote provisions of the First and Fourteenth Amendments of the United States Constitution and article I, section 5 of the Alaska Constitution, rather than through a separate equal protection analysis. Accordingly, we address the Green Party's equal protection claim only insofar as it addresses a deprivation of the right to vote.

**25.** *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982) (*Vogler I*) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)).

**26.** Former AS 15.60.010(21).

**27.** *Id.* To obtain recognized political party status, the Green Party would have needed to register

6,945 voters; as of September 2003, it had registered only 4,740 voters.

**28.** AS 15.25.140–.200. Petitions for statewide office must be signed by at least one percent of the number of voters who cast ballots in the preceding general election. AS 15.25.160.

**29.** *Green Party*, 118 P.3d at 1060.

**30.** *Vogler I*, 651 P.2d at 3.

**31.** *State, Div. of Elections v. Metcalfe*, 110 P.3d 976, 980 (Alaska 2005).

**32.** *Id.* ("[The state asserts] an interest 'in avoiding confusion, deception, and even frustration of the democratic process at the general election.'

here in drawing a line in order to establish a standard for the "modicum of support" required for official party status is compelling. This interest therefore justifies the burden that the statute imposes.

### 4. The statute was sufficiently narrowly tailored to the state's interests to justify burdening the rights of the Green Party.

The Green Party concedes that the state has a legitimate interest in regulating ballot access, but it argues that the statute, by excluding groups that have demonstrated a significant modicum of support in races other than the governor's race, was not sufficiently tailored. It suggests that the state could have adopted the less restrictive alternative of granting ballot access to each political group that polls at least three percent of the vote in any statewide race. The superior court relied on *Metcalfe* to hold that, while the legislature did not choose the least restrictive alternative, it chose a reasonable alternative: "While there are certainly less restrictive alternatives to former AS 15.60.010(21)'s benchmark of tying the three percent minimum threshold to the gubernatorial election, in accordance with the *Metcalfe* opinion's deference to the legislature in making election decisions [ ] this court cannot say that the legislature's use of the gubernatorial election ... was unreasonable." We agree.

We began our analysis in *Metcalfe* by noting the difficulties we faced in determining the constitutionality of a numerical line drawn by the legislature, since "line-drawing always involves close cases at the margins, and we cannot quantify with mathematical precision where the constitutional line is to be found."[33] Because such questions involve considerable balancing by policy-makers, we concluded that deference to the legislature was appropriate. As we explained, "Legisla-

tures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."[34]

The Green Party now contends, as it did before the superior court, that legislative deference is less appropriate here because the Green Party is not challenging a numerical cutoff but rather the choice of a particular statewide race to measure that cutoff. But the court's task is not to quantify the level of deference owed to a legislative decision; it is to determine whether the legislature has sufficiently narrowly tailored the statutory scheme to protect both the Green Party's constitutional rights and the state's compelling interests. We agree with the superior court that, in choosing the race for the office of governor as the touchstone contest, the legislature met its constitutional obligations.

The state selected a narrowly tailored approach that burdens voters and candidates only slightly, while protecting the state's interest in avoiding voter confusion, ballot overcrowding, and the presence of frivolous candidates.[35] Because the gubernatorial term (unlike federal statewide offices) is limited, there will be non-incumbents running at regular intervals.[36] Consequently, the governor's race is the only statewide election in which a competitive race may be predicted with some confidence. Given the more reliably competitive nature of the race, it was not unreasonable for the legislature to conclude that the governor's race offers a better gauge for popular support of a political party.

Furthermore, in *Metcalfe* we recognized that the state could satisfy its burden of determining whether less restrictive alternatives exist by showing that its actions remain "in the mainstream of the practices of other

We found this interest sufficiently important under the constitutional test." (quoting *Vogler v. Miller*, 660 P.2d 1192, 1195 (Alaska 1983))).

33. *Metcalfe*, 110 P.3d at 981.

34. *Id.* (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)).

35. *See O'Callaghan*, 914 P.2d at 1254.

36. "No person who has been elected governor for two full successive terms shall be again eligible to hold that office until one full term has intervened." ALASKA CONST art. III, § 5.

states." [37]  In that case we determined that Alaska's three percent requirement was well within the mainstream of other states.[38]  Relying on this finding, in conjunction with the deference accorded the legislature on ballot access issues, we decided that there was no "valid legal ground ... leading to the conclusion that the legislature acted unreasonably in enacting a three percent requirement." [39]

Eight states, including Alaska under former AS 15.60.010(21), rely on a percentage of the total number of votes cast for governor to determine political party status.[40]  Twelve other states use a percentage of the total number of votes for either governor or presidential electors.[41]  Based on these statistics we concur with the superior court that Alaska's requirements are "within the mid-range" of other states, and that the legislature acted reasonably in using this standard to determine party eligibility.

## V.  CONCLUSION

The state has a compelling interest in regulating ballot access, and the statute in question is sufficiently narrowly tailored to achieve that goal without violating the constitutional rights of Green Party voters and candidates.  We therefore AFFIRM the superior court's decision granting summary judgment to the state.

**37.**  *Metcalfe,* 110 P.3d at 981.

**38.**  *Id.*

**39.**  *Id.*

**40.**  *See* 10 Ill. Comp. Stat. Ann. 5/10–2 (West 2006); Kan. Stat. Ann. § 25–202(b) (1993); Mont.Code Ann § 13–10–601 (2005); Neb.Rev.Stat. § 32–716(1) (2005); N.Y. Elec. Law § 1–104(3) (McKinney 1998); S.D. Codified Laws § 12–1–3(10) (2006); W. Va.Code § 3–1–8 (West 2006).

**41.**  *See* Ariz.Rev.Stat. Ann. § 16–804 (2005); Ark Code Ann. § 7–1–101(17)(A) (West 2006); Colo. Rev.Stat Ann. § 1–1–104(22) (West 2006); Ga Code Ann. § 21–2–2(25) (West 2006); Iowa Code Ann § 43.2 (West 1999, Supp.2006); Me.Rev. Stat. Ann. tit. 21–A, § 301 (2006); N.M. Stat. Ann. § 1–1–9 (West 2006); N.C. Gen.Stat. Ann. § 163–96(a)(1) (West 2006); N.D. Cent.Code § 16.1–11–30 (2005); Ohio Rev.Code Ann. § 3517.01(A)(1) (West 2006); Okla. Stat. tit. 26, § 1–109 (1997, Supp.2006); R.I. Gen. Laws § 17–1–2(9) (2005).