**STATE of Alaska, Division of Elections, and Janet Kowalski, Appellants,**

v.

**The GREEN PARTY OF ALASKA and the Republican Moderate Party, Inc., Appellees.**

**No. S–11272.**

Supreme Court of Alaska.

Aug. 12, 2005.

---

Sarah J. Felix, Assistant Attorney General, and Gregg D. Renkes, Attorney General, Juneau, for Appellants.

Kevin M. Morford, Chugiak, for Appellees.

Jonathan B. Rubini and Suzanne La Pierre, Anchorage, for Amicus Curiae Alaska Civil Liberties Union.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

BRYNER, Chief Justice.

## I. INTRODUCTION

Alaska election statutes governing primary elections require each political party to have its own primary ballot on which only candidates of that political party appear. The Green Party of Alaska and the Republican Moderate Party challenge those statutes, arguing that, by making it unlawful for them to present their candidates together on a combined ballot, the statutes unconstitutionally burden their associational rights. We hold that the statutes substantially burden a political party's right to determine who may participate in its primary and that the state's justification for imposing this burden is insufficient. We therefore hold that the contested provisions violate the Alaska Constitution.

## II. FACTS AND PROCEEDINGS

Before 2000 Alaska had a blanket primary system. A blanket primary features a single ballot that "lists every candidate regardless of party affiliation and allows the voter to choose freely among them."[1] In a blanket primary all voters may vote for any candidate from any political party, and "the candidate of each party who wins the greatest number of votes is the nominee of that party at the ensuing general election."[2] Under the blanket primary system as it existed in Alaska, "a registered Republican might vote for an Alaskan Independence Party candidate for Governor, a Republican for United States House of Representatives, and a Democrat for State Senate."[3]

In *California Democratic Party v. Jones,* the United States Supreme Court held that California's blanket primary violated political parties' associational rights because it required them to allow non-members to vote in the political parties' primaries even where a political party wished to exclude non-members.[4] Because California's blanket primary was in all relevant respects identical to Alaska's, the effect of *Jones* was to render Alaska's primary system unconstitutional.

In 2001 the Alaska legislature revised Alaska's election statutes to comply with *Jones.*[5] The legislature considered a number of primary systems, including closed and open primaries. In a closed primary, each political party has its own ballot and only members of a party may vote that party's ballot.[6] In an open primary, each political party likewise has its own ballot, but the ballot is not limited to party members: any voter may select a ballot of any political party. The main difference between a blanket primary and an open primary is that in a blanket primary, the voter may "vote for candidates for the nomination of different political parties for various offices,"[7] whereas in an open primary "any voter may vote for candidates for any political party's nomination, but the voter may only vote for candidates running for one political party's nomination."[8]

The Alaska legislature ultimately decided to allow each political party to determine for

---

1. *California Democratic Party v. Jones,* 530 U.S. 567, 570, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

2. *Id.* (internal quotations omitted).

3. *O'Callaghan v. State,* 914 P.2d 1250, 1254–55 (Alaska 1996) (*O'Callaghan II* ).

4. 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

5. Ch. 103, § 1(1), SLA 2001.

6. *O'Callaghan II,* 914 P.2d at 1254.

7. *Id.*

8. *Id.*

itself whether to have a closed, an open, or a partially closed primary. Under the new primary system, codified at AS 15.25.010, .014, and .060, each political party has its own ballot "that contains all of the candidates of that party for elective state executive and state and national legislative offices." [9] The default provisions of the election code create a partially closed primary. Under those provisions only members of a political party and unaffiliated voters may vote in the party's primary.[10] But a political party may opt out of the default provisions. Alaska Statute 15.25.014 allows a political party to choose to exclude unaffiliated voters on the one hand or to open its primary to registered members of other parties on the other. Under AS 15.25.014, provided that a political party complies with certain procedural requirements,

> the director [of elections] shall permit a voter registered as affiliated with another party to vote the party's ballot if the voter is permitted by the party's bylaws to participate in the selection of the party's candidates and may not permit a voter registered as nonpartisan or undeclared to vote a party's ballot if the party's bylaws restrict participation by nonpartisan or undeclared voters in the party's primary.[11]

Thus, under the new system, a political party can choose to have a closed primary—in which only members of that party may vote—an open primary—in which all registered voters may vote—or something in between. Indeed, nothing in the current statutory scheme prohibits a political party from opening its ballot to registered members of some parties while excluding members of other parties.

Although political parties have great leeway under the current system and may open their ballots to a broad spectrum of voters, each political party is nonetheless required to have its own ballot on which only its candidates may appear.[12] As a result, a voter must choose one ballot out of all those potentially available and may therefore participate in only one political party's primary.

> A voter may vote only one primary election ballot. A voter may vote a political party ballot only if the voter is registered as affiliated with that party, is allowed to participate in the party primary under the party's bylaws, or is registered as nonpartisan or undeclared rather than as affiliated with a particular political party and the party's bylaws do not restrict participation by nonpartisan or undeclared voters in the party's primary.[13]

Unlike the blanket system, under the current primary system a voter cannot participate in different political parties' primaries for different political offices. Whereas under the old system a voter could vote for a Green Party candidate for governor and a Republican Moderate candidate for senator, the current system does not allow a voter to split a primary ticket.

For the August 2002 primary election the Green Party and the Republican Moderate Party wished to share a ballot on which both political parties' candidates would appear. The state refused to allow the combined ballot and the Green and Republican Moderate parties instead ran their candidates on separate ballots.[14]

Shortly after the 2002 election both the Green and Republican Moderate parties filed

---

9. AS 15.25.060(a).

10. AS 15.25.010 provides:

Candidates for the elective state executive and state and national legislative offices shall be nominated in a primary election by direct vote of the people in the manner prescribed by this chapter. The director shall prepare and provide a primary election ballot for each political party. A voter registered as affiliated with a political party may vote that party's ballot. A voter registered as nonpartisan or undeclared rather than as affiliated with a particular political party may vote the political party ballot of the voter's choice unless prohibited from doing so under AS 15.25.014. A voter registered as affiliated with a political party may not vote

the ballot of a different political party unless permitted to do so under AS 15.25.014.

11. AS 15.25.014(b).

12. AS 15.25.060.

13. AS 15.25.060(b).

14. Following the general election, both the Green and Republican Moderate parties lost their official party status since they each failed to poll at least three percent of the total votes for governor at the general election. *See* AS 15.60.010(23). Each is still recognized as a "political group" under AS 15.60.010(22).

suit against the state, challenging the requirement that each political party have a separate ballot. They argued that the state's refusal to permit them to have a joint ballot—one on which candidates for both political parties were listed and that was open to members of both political parties—violated their First and Fourteenth Amendment rights under the United States Constitution.[15] After oral argument, the superior court found that the contested provisions were unconstitutional and granted summary judgment to the Green and Republican Moderate parties.

The state appeals.

## III. DISCUSSION

### A. Standard of Review

 This court reviews a grant of summary judgment de novo and will affirm if, when the facts are viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[16] Constitutional claims, like those presented in this case, are questions of law and are reviewed de novo.[17] In conducting de novo review, we will "adopt the rule of law that is most persuasive in light of precedent, reason, and policy." [18]

### B. The Prohibition on Combined Ballots Unconstitutionally Burdens the Green and Republican Moderate Parties' Associational Rights.

The political parties argue that Alaska's new primary system violates rights protected by both the United States and the Alaska constitutions. Our analysis of whether elec-tion laws violate the United States Constitution is controlled by United States Supreme Court precedent. In *O'Callaghan II* and *Sonneman v. State*, we reviewed the Supreme Court's recent approach to assessing the constitutionality of election laws.[19] We noted that although the Court has repeatedly stressed the importance of protecting the right to participate in the political process, it has also recognized that in order to ensure that elections are orderly and fair, "government must play an active role in structuring elections." [20] Since "[e]lection laws will invariably impose some burden upon individual voters," [21] states must be granted some leeway.[22] To subject all laws governing elections to strict scrutiny "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." [23]

 To protect states' ability to regulate elections, the Supreme Court has therefore applied a "flexible standard" to election laws that impinge on rights protected by the United States Constitution. Under this standard, a court

must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.[24]

This test allows a court to determine whether an election law violates the United States Constitution.

Although we need not adopt the same test when determining whether a law violates the

---

**15.** U.S. Const., amend. I, § 4, cl. 1.

**16.** *Sonneman v. State*, 969 P.2d 632, 635 (Alaska 1998).

**17.** *Id.* at 636.

**18.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**19.** *O'Callaghan II*, 914 P.2d at 1253–54, 1257–59; *Sonneman*, 969 P.2d at 636–37.

**20.** *O'Callaghan II*, 914 P.2d at 1253 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992)).

**21.** *Id.* (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059).

**22.** *Id.* at 1254 (quoting *Burdick*, 504 U.S. at 433–34, 112 S.Ct. 2059).

**23.** *Id.* (quoting *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059).

**24.** *Id.* (quoting *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059).

Alaska Constitution,[25] we think that this test, to the extent that it involves a careful balancing of the importance and necessity of the election law against the infringement of constitutionally protected rights, fits well with our own constitutional jurisprudence. We have often indicated that determining whether a state law violates the Alaska Constitution requires a nuanced balancing of the asserted rights against the interests claimed by the state. We have generally eschewed applying rigid formulas when analyzing the constitutionality of Alaska laws. For example, in our equal protection jurisprudence we have adopted a sliding-scale approach; under this approach, we "place[ ] a progressively greater or lesser burden on the state, depending on the importance of the individual right affected by the disputed classification."[26] Similarly, when determining whether a challenged statute violates the right to privacy protected by the Alaska Constitution, we have held that "the rights to privacy and liberty are neither absolute nor comprehensive ... their limits depend on a balance of interests."[27] And we have indicated that when determining whether a statute violates the Alaska Constitution's right to free speech, "there must be ... a balancing of conflicting rights and interests."[28] Because the Supreme Court's test requires a similar balancing, we employ it here for evaluating whether the challenged election law violates the Alaska Constitution.[29]

By using the Supreme Court's approach to determining the constitutionality of election laws, however, we do not mean to suggest that an election law that falls within the bounds of the United States Constitution is necessarily constitutional under the Alaska Constitution. To be sure, the United States Constitution as interpreted by the Supreme Court sets "national minimal constitutional standards"[30] with which Alaska election laws must comply. But we have often held that Alaska's constitution is more protective of rights and liberties than is the United States Constitution.[31] In *Vogler v. Miller*, for instance, we found that the free speech guarantee of article I, section 5 of the Alaska Constitution[32]—under which we decide challenges to election laws—is more protective of the right to participate in the political process than its federal counterpart, the First Amendment to the United States Constitution.[33] We therefore stress that the results

**25.** *See, e.g., Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 404 (Alaska 2004) ("State courts are not necessarily bound by the United States Supreme Court's decisions when they consider issues of state constitutional law.").

**26.** *Malabed v. North Slope Borough*, 70 P.3d 416, 420–21 (Alaska 2003).

**27.** *Sampson v. State*, 31 P.3d 88, 91 (Alaska 2001).

**28.** *Messerli v. State*, 626 P.2d 81, 83 (Alaska 1980).

**29.** Adopting a flexible balancing test for evaluating the constitutionality of election laws does not conflict with our recent decision in *State, Division of Elections v. Metcalfe*, 110 P.3d 976, 979–80 (Alaska 2005), in which we applied strict scrutiny to a law restricting a candidate's access to the general election ballot. The level of scrutiny applied in *Metcalfe* merely indicates that laws that restrict ballot access place a presumptively heavy burden on fundamental rights and the state must therefore offer weighty reasons to justify those restrictions.

**30.** *State v. Browder*, 486 P.2d 925, 936 (Alaska 1971).

**31.** *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982) (*Vogler I*); *see also Malabed*, 70 P.3d at 420 (noting that "the Alaska Constitution's equal protection clause affords greater protection to individual rights than the United States Constitution's Fourteenth Amendment."); *State v. Gonzalez*, 853 P.2d 526 (Alaska 1993) (declining to incorporate the federal standard for determining whether the privilege against self-incrimination had been violated when determining the reach of the privilege as defined by the Alaska Constitution); *State v. Jones*, 706 P.2d 317 (Alaska 1985) (interpreting Alaska's prohibition on unreasonable search and seizures more broadly than the federal prohibition); *Browder*, 486 P.2d 925 (reading the right to a jury trial in cases of criminal contempt more broadly than the corresponding federal right).

**32.** Article I, section 5 provides that: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

**33.** *Compare Vogler I*, 651 P.2d 1 (holding unconstitutional under the Alaska Constitution a requirement that independent candidates submit petitions with signatures of three percent of the vote cast at the last election in order to be placed on the general election ballot) *with Jenness v.*

we derive under the Alaska Constitution need not correspond with those the Supreme Court might reach under the federal constitution.

■ Our approach involves four steps. When an election law is challenged the court must first determine whether the claimant has in fact asserted a constitutionally protected right. If so we must then assess "the character and magnitude of the asserted injury to the rights." [34] Next we weigh "the precise interests put forward by the State as justifications for the burden imposed by its rule." [35] Finally, we judge the fit between the challenged legislation and the state's interests in order to determine "the extent to which those interests make it necessary to burden the plaintiff's rights." [36] This is a flexible test: as the burden on constitutionally protected rights becomes more severe, the government interest must be more compelling and the fit between the challenged legislation and the state's interest must be closer.

### 1. The parties have a right under the United States and Alaska constitutions to determine who may participate in choosing their candidates.

■ The political parties argue that the prohibition on combined ballots severely restricts the right to access the ballot, voting rights, and the political parties' rights to associate with voters and with each other. The state argues that this is not a ballot

access case, that voters have no "fundamental right to vote in a primary election for all candidates, regardless of party affiliation," that states may restrict voters to participating in only one political party's primary, and that political parties do not have any right to associate with each other by way of the ballot. We conclude that political parties have a constitutionally protected associational interest in opening their ballots to voters who would otherwise vote in the primaries of their own political parties.[37]

Before we explain the reasoning underlying our conclusion, we wish to emphasize that this case does not address whether the legislature can prohibit so-called fusion candidates. In *Timmons v. Twin Cities Area New Party,*[38] the Supreme Court addressed the constitutionality of a Minnesota statute that "preclude[d] one party's candidate from appearing on the [general election] ballot, as that party's candidate, if already nominated by another party." [39] The statute prohibited a candidate from being listed twice—once for each political party—on the general election ballot. The New Party challenged the statute, arguing that the political party had a right to associate with the candidate of its choice, even if that candidate was already the nominee of another political party.[40] The Court characterized Minnesota's ban on fusion candidacies as an eligibility requirement: under Minnesota law, a candidate was only eligible to appear as one political party's candidate if not already the candidate of another political party.[41] The Court held that the ban on so-

*Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971) (finding constitutional under the United States Constitution a requirement that independent candidates submit petitions with signatures of at least five percent of eligible voters in order to be placed on the general election ballot).

**34.** *O'Callaghan II,* 914 P.2d at 1254 (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

**35.** *Id.* (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

**36.** *Id.* (quoting *Burdick,* 504 U.S. at 434, 112 S.Ct. 2059).

**37.** Because we decide this case on the basis of the right of consenting political parties to determine who may participate in their primaries, we need not address whether or to what extent the statutes burden the candidates' right to ballot access, the voting rights of individual voters, or

the rights of political parties to associate with each other.

**38.** 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997).

**39.** *Id.* at 360, 117 S.Ct. 1364.

**40.** *Id.* at 355, 117 S.Ct. 1364.

**41.** *Id.* at 359, 117 S.Ct. 1364. The Court has consistently upheld reasonable candidate-eligibility requirements. For cases in which the Court has upheld reasonable eligibility requirements for candidates, see *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (affirming Hawaii's prohibition on write in candidacies), and *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (upholding California laws forbidding a ballot position to independent candidates who had been members of political parties less than one year prior to the

called fusion candidacies did not "severely burden that party's associational rights"[42] and upheld the statute.

The state contends that *Timmons* is similar to the present case because "in both cases a political party sought to associate with another political party through the election ballot." The state argues that because the Court upheld Minnesota's restriction on party-party association, we should uphold Alaska's prohibition of joint ballots.

But *Timmons* does not speak to the present electoral scheme. Broadly put, the statute in *Timmons* limited a political party's right to associate by means of the general election ballot with another political party's candidate. More specifically, the statute in *Timmons* imposed an eligibility requirement upon candidates: a candidate was only eligible to be placed on the general election ballot as one political party's candidate if not already on the ballot as the candidate of another political party. By contrast, the statutes challenged here do not impose eligibility requirements upon candidates. Indeed, the goal of the Green and Republican Moderate parties is not to associate with the other political party's *candidates*, but rather to associate with a broader spectrum of *voters*. Further, unlike the statute in *Timmons*, which governed the general election and only affected a political party's actions after it had chosen its candidate, the statutes challenged here directly limit who may participate in choosing a political party's candidates. In other words, *Timmons* does not help us resolve the present case because the central question in this case—whether and to what

extent a state may restrict who may vote in a political party's primary—was simply not at issue in *Timmons*.

We now turn our attention to the Green and Republican Moderate parties' argument that under the United States and the Alaska constitutions the political parties have a right to associate with as broad a spectrum of voters as possible. The Supreme Court has repeatedly affirmed that "partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments."[43] The Court has held that national political parties have the right to require that only registered political party members participate in choosing delegates to the national conventions.[44] National political parties also may require that only political party members participate in deciding how delegates to the national convention may vote.[45] The Court has held that state laws prohibiting political parties from endorsing candidates in primary elections unconstitutionally burden political parties' associational rights.[46] And it has held that states may not regulate "a political party's decisions about the identity of, and the process for electing," the political party's official governing body, unless it can show that "such regulation is necessary to ensure an election that is orderly and fair."[47] Finally, and most importantly for the present case, the Court has affirmed political parties' right to determine who will participate in "the 'basic function' of selecting the Party's candidates."[48]

In *Tashjian v. Republican Party of Connecticut*, the Court considered the constitu-

immediately preceding primary election). For cases where the Court struck eligibility requirements as unconstitutional, see *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (holding that a requirement that independent candidates for president file a statement of candidacies and nominating position eight months before the general election was an unreasonable eligibility requirement), and *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (holding that Texas's filing fees were unreasonably high and did not constitute a legitimate eligibility requirement).

**42.** *Timmons*, 520 U.S. at 359, 117 S.Ct. 1364.

**43.** *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 224, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).

**44.** *Cousins v. Wigoda*, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975).

**45.** *Democratic Party of the United States v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (holding that where state regulations governing primaries conflicted with national political party regulations, the state could not force delegates to the national convention to vote in accord with the primary results).

**46.** *Eu*, 489 U.S. at 229, 109 S.Ct. 1013.

**47.** *Id.* at 229 & 232, 109 S.Ct. 1013.

**48.** *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 216, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (quoting *Kusper v. Pontikes*, 414 U.S. 51, 58, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)).

tionality of a Connecticut election law that restricted participation in primary elections to political party members.[49] The Republican Party challenged this restriction, arguing that it had a right to allow independent voters to participate in its primary.[50]

The Court held that the Connecticut law was unconstitutional.[51] The Court distinguished the situation in *Tashjian* from earlier cases where it had rejected "claims by non-members of a party seeking to vote in that party's primary despite the party's opposition." [52] In those cases, the Court upheld state laws that sought to "prevent the disruption of political parties from without" [53] because "the nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications." [54] In *Tashjian,* in contrast, there was "no conflict between the associational interests of members and nonmembers." [55] Rather, the political party itself wished to invite independent voters to participate in its primary election. The Court held that though this desire might seem "unwise or irrational,"

> a state, or a court, may not constitutionally substitute its own judgment for that of the Party. The Party's determination of the

boundaries of its own association ... is protected by the Constitution.[56]

The Court held that the political party's effort to "broaden the base of public participation in and support for its activities," was "conduct undeniably central to the exercise of the right of association." [57] In the Court's view, the challenged statute "limit[ed] the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." [58] Moreover the statute was not narrowly tailored to achieve the state's claimed goals of "ensuring the administrability of the primary system, preventing raiding, avoiding voter confusion, and protecting the responsibility of party government." [59] Accordingly, the Court struck the statute as unconstitutional.[60]

In *California Democratic Party v. Jones*[61] the Court confronted the opposite situation. Before *Jones,* the California primary system provided that "[a]ll persons entitled to vote, including those not affiliated with any political party shall have the right to vote ... for any candidate regardless of the candidate's political affiliation." [62] The California system thus forced political parties to open their primaries to non-members.[63] Several political parties challenged the blanket primary, argu-

**49.** *Id.* at 210, 107 S.Ct. 544.

**50.** *Id.* at 211, 107 S.Ct. 544.

**51.** *Id.* at 225, 107 S.Ct. 544.

**52.** *Id.* at 216 n. 6, 107 S.Ct. 544. For cases in which the Court affirmed state requirements of political party membership as a qualification for voting in a primary, see *Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (holding that a requirement that a voter register with the political party of his choice thirty days before the general election in order to vote in his political party's next primary was a legitimate time limitation and therefore constitutional). *See also Nader v. Schaffer,* 417 F.Supp. 837 (D.Conn. 1976), *summ. aff'd,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976) (holding that a voter does not have a right to vote in the primary of a political party of which he is not a member and that a statute that requires political party membership to vote in that political party's primary was constitutional). *But see Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (holding unconstitutional a statute that prohibited a person from voting in a political party's

primary if he had voted in another political party's primary within twenty-three months).

**53.** *Tashjian,* 479 U.S. at 224, 107 S.Ct. 544.

**54.** *Id.* at 215 n. 6, 107 S.Ct. 544.

**55.** *Id.*

**56.** *Id.* at 224, 107 S.Ct. 544 (citation omitted).

**57.** *Id.* at 214, 107 S.Ct. 544.

**58.** *Id.* at 216, 107 S.Ct. 544.

**59.** *Id.* at 217, 107 S.Ct. 544.

**60.** *Id.* at 225, 107 S.Ct. 544.

**61.** 530 U.S. 567, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000).

**62.** *Id.* at 570, 120 S.Ct. 2402 (quoting Cal. Elec. Code Ann. § 2001).

**63.** *Id.* at 571, 120 S.Ct. 2402.

ing that they had a right to exclude non-members from participating in their primaries.[64]

The Court reaffirmed the reasoning behind *Tashjian*, stressing "the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.' "[65] The Court held that the First Amendment not only protects a political party's right to reach out to independent voters; it also protects a political party's right to limit participation in the political party's primary to registered members of that political party.

> In no area is the political association's right to exclude more important than in the process of selecting its nominee. That process often determines the party's positions on the most significant public policy issues of the day, and even when those positions are predetermined it is the nominee who becomes the party's ambassador to the general electorate in winning it over to the party's views.[66]

The Court therefore held that California's blanket primary was unconstitutional.[67]

The Green and Republican Moderate parties argue that *Tashjian* and *Jones* compel the conclusion that they have a right to open their ballots to registered members of the other political party who intend to vote in their own political party's primary. The state responds that *Tashjian* supports no such right; it relies on the Court's marginal notation in *Tashjian* that

> [a] party seeking, for example, to open its primary to all voters, including members of other parties, would raise a different combination of considerations. Under such circumstances, the effect of one party's broadening of participation would

threaten other parties with . . . disorganization effects.[68]

It is true that the Court in *Tashjian* limited its holding to independent voters. But the cited passage does not go to the existence of a political party's right to determine who will participate in selecting its candidates; rather, the Court there speculates that a state's interest in restricting the exercise of a political party's right might be of sufficient weight to justify burdening that right.

■ The overarching principle uniting *Tashjian* and *Jones* is that the First Amendment protects the rights of voters to band together as parties to pursue political ends.[69] This freedom, the Court has affirmed, "necessarily presupposes the freedom to identify the people who constitute the association."[70] This right is perhaps nowhere more important than during a primary election: it is at the primary election that political parties select the candidates who will speak for them to the broader public and, if successful, will lead their political party in advancing its interests. In addition, as the Court recognized in *Tashjian*, a political party may desire to open its primary ballot to a wider spectrum of voters in order to allow the political party and its members "to inform themselves as to the level of support for the Party's candidates among a critical group of electors."[71]

■ The right to determine who may participate in selecting its candidates—and, if the political party so desires, to seek the input and participation of a broad spectrum of voters—is of central importance to the right of political association. We think that the Green and Republican Moderate parties' First Amendment rights under the United States Constitution include a right to share a ballot and thereby to seek the participation of members of the other political party who, if forced to choose, would vote in their own political party's primary. But even if this conclusion might overestimate the reach of the Federal Constitution,[72] we hold that the

**64.** *Id.*

**65.** *Id.* at 575, 120 S.Ct. 2402 (internal citations omitted).

**66.** *Id.*

**67.** *Id.* at 586, 120 S.Ct. 2402.

**68.** *Tashjian*, 479 U.S. at 224 n. 13, 107 S.Ct. 544.

**69.** *Id.* at 215, 107 S.Ct. 544.

**70.** *Id.* at 214, 107 S.Ct. 544 (quoting *Democratic Party of the United States*, 450 U.S. at 122, 101 S.Ct. 1010).

**71.** *Id.* at 221, 101 S.Ct. 1010.

**72.** *See Clingman v. Beaver*, —— U.S. ——, ——, 125 S.Ct. 2029, 2036, 161 L.Ed.2d 920 (2005)

Alaska Constitution protects a political party's right to determine for itself who will participate in crystallizing the political party's political positions into acceptable candidates. As Justice Rabinowitz commented in his dissent in *O'Callaghan II*, "[i]t is within the province of a party to decide who will nominate its candidates." [73]

### 2. The prohibition on combined ballots places a substantial burden on the Green and Republican Moderate parties' associational rights.

■■■ Having concluded that the political parties' associational rights are at stake, we must determine the extent to which the Alaska primary system burdens those rights. By limiting voters to a single primary ballot on which the candidates of only one political party may appear, the prohibition on combined ballots creates a de facto election-day registration requirement. Voters must choose to fully affiliate themselves with a single political party or to forgo completely the opportunity to participate in that political party's primary. This places a substantial restriction on the political party's associational rights. The choice that the state forces a voter to make means that a political party cannot appeal to voters who are unwilling to limit their primary choices to the relatively narrow ideological agenda advanced by any single political party. Neither the Green Party nor the Republican Moderate Party here wished to have its candidates selected only by voters who are willing to choose that particular political party to the exclusion of others. Rather, the political parties sought to have their candidates elected by a broader spectrum of voters—one which includes voters who might otherwise be unwilling to sign on to the entirety of the political party's agenda or slate of candidates but who would have wanted to support some of the political party's candidates. The state's restriction on the spectrum of voters allowed to select a political party's candidates will have a significant effect, not just upon which candidates the political party ultimately nominates, but also on the ideological cast of the nominated candidates. Alaska's election code prevents the political parties themselves from determining who will be allowed to participate in "select[ing] a standard bearer who best represents [their] ideologies and preferences." [74] The code therefore substantially restricts the parties' associational rights.

### 3. The interests the state relies upon to justify the restrictions on the Green and Republican Moderate parties' associational rights are either too abstract to support the restrictions or are not narrowly tailored to achieve those interests.

■■■ We must next determine whether the state has identified interests sufficiently important to justify the prohibition on combined ballots and if so whether the challenged legislation actually advances those interests without unnecessarily restricting the political parties' right to appeal to a broad spectrum of voters. We have acknowledged, following the Supreme Court, that "[i]n evaluating interests underlying state election laws 'a particularized showing' is not required." [75] The state need not wait until problems in the electoral process actually materialize to take action, since "[l]egisla-

(suggesting, when discussing an Oklahoma statute that prohibits political parties from opening their ballots to registered members of other parties, that "a voter who is unwilling to disaffiliate from another party to vote in [a party's] primary forms little 'association' with the [party]—nor [the party] with him"). Because we hold that the election statutes substantially burden rights protected by the Alaska Constitution, the Supreme Court's analysis in *Clingman* does not control our resolution of this case. In ruling that the Alaska Constitution protects a party's right to determine who may participate in its primary, we agree with the general approach suggested by Justice O'Connor's concurrence in *Clingman*: "where a party invites a voter to participate in its primary and the voter seeks to do so, we should

begin with the premise that there are significant associational interests at stake. From this starting point, we can then ask to what extent and in what manner the State may justifiably restrict those interests." *Clingman*, 125 S.Ct. at 2044 (O'Connor, J., concurring).

73. *O'Callaghan II*, 914 P.2d at 1266 (Rabinowitz, J., dissenting).

74. *Eu*, 489 U.S. at 224, 109 S.Ct. 1013 (internal quotations and citations omitted).

75. *O'Callaghan II*, 914 P.2d at 1254 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 194, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)).

tures ... should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." [76] But while the state may anticipate likely problems in the electoral process, it cannot justify imposing significant constitutional burdens merely by asserting interests that are compelling only in the abstract. As Justice Rabinowitz observed in considering the constitutionality of another election law: "it is not sufficient for the state to assert theoretical possibilities, albeit undesirable ones, to justify incursions upon free speech rights protected by the Alaska Constitution." [77] Instead, the state must explain why the interests it claims are concretely at issue and how the challenged legislation advances those interests. And in reviewing the adequacy of the state's explanation, a court must ask not "in the abstract ... whether fairness, privacy, etc., are highly significant values[ ] but rather ... whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." [78]

Here, the state points to a number of generalized interests that it claims justify prohibiting combined ballots: holding primary elections, complying with *Jones*, avoiding ballot overcrowding, requiring political parties to show that they have community support, strengthening political parties, preserving political stability, encouraging the two-party system, avoiding voter confusion, and holding orderly and efficient primary elections. But most of these interests are simply too abstract to justify a substantial restriction upon the Green and Republican Moderate parties' associational rights.

The state articulates an interest in nominating "party candidates through a primary election rather than through direct party selection of candidates." While this interest is clearly legitimate,[79] it is not concretely at issue here. The political parties are not seeking to do away with primary elections. Rather, they challenge the way the primary election is conducted.

Similarly, the state's interest in complying with *Jones*, while obviously compelling, would not be placed at risk by allowing combined ballots. In *Jones*, the Supreme Court held that where a political party desires to exclude non-members from the primary process it has a right to do so.[80] But here, the political parties actively sought to open their ballots to a broader spectrum of each other's voters; the state's interest in complying with *Jones* is simply not threatened.

The state also asserts that the prohibition on combined ballots is justified as a means of avoiding ballot overcrowding. But merely reciting this abstract interest is hardly sufficient. Here, to the extent that the state argues that combined ballots will increase the overall number of candidates running in the primary election and will therefore lead to ballot overcrowding, its argument is not well taken. As the superior court noted, "prohibiting combined ballots does not reduce the number of candidates who will be appearing on the ballots." To the extent that the state's argument is based on the prediction that combined ballots may result in more candidates per ballot, its prediction is probably accurate but provides no realistic grounds for concern. Considering Alaska's long experience with the blanket primary ballot—on which the candidates of many political parties were commonly listed—and the absence of any historical problem of overcrowding, it seems unrealistic to fear that a ballot shared by two political parties would create problems of overcrowding. Because the state does not face a credible threat of ballot overcrowding, this interest is not actually at issue and will not support the challenged legislation.

We next address the state's interest in requiring that political party candidates show a modicum of support from voters. The state maintains that "[t]he combined party ballot undercuts this interest because a voter can choose that ballot without taking action to associate with a particular party." The

---

**76.** *Id.* (quoting *Munro,* 479 U.S. at 195, 107 S.Ct. 533).

**77.** *Vogler v. Miller,* 660 P.2d 1192, 1196 (Alaska 1983) (*Vogler II* ) (Rabinowitz, J., concurring).

**78.** *Jones,* 530 U.S. at 584, 120 S.Ct. 2402.

**79.** *See O'Callaghan v. State,* 6 P.3d 728, 732 (Alaska 2000) (*O'Callaghan III* ).

**80.** *Jones,* 530 U.S. at 582–85, 120 S.Ct. 2402.

state has an admittedly important interest in requiring that candidates and political parties demonstrate that they have a modicum of community support before placing them on the general election ballot.[81] But, as with the interests already discussed, allowing combined ballots does not implicate this interest and is therefore not concretely at issue. In Alaska, the number of voters who participate in a political party's primary has no bearing on the political party's showing of community support. A political party qualifies to place its nominees on the general election ballot in two ways: (1) the party's candidates will be placed on the general election ballot if its registered voters are equal in number to at least three percent of the total votes cast for governor, for United States senator, or for United States representative (depending on which of those offices was on the ballot) at the preceding *general* election; and (2) the party's candidates will also be placed on the general election ballot if its candidate for governor, United States senator, or United States representative (depending on which of those offices was on the ballot) received at least three percent of the total votes cast for that office at the preceding *general* election.[82] Because a political party's level of support at the primary election is not relevant in determining whether the party has enough community support to qualify for a place on the general election ballot, the state's interest in requiring community support is not threatened by combined ballots.

The state also maintains that its interest in strengthening political parties is a sufficient ground to uphold the challenged restriction. The state points, for example, to Representative Coghill's hope that the closed primary statutes would help revitalize the political party system in Alaska. The House Judiciary Minutes show that Representative Coghill,

> acknowledged that in Alaska, many people have chosen not to affiliate with a party, but he said he thought that was partly because the state allows [undeclared and

nonpartisan voters] to participate in determining a party's nominee. "We've got the cart before the horse here in Alaska," he said. And while he acknowledged that if parties stay closed, members would become "purists," he said he believed that at that point, the parties would be enlivened and thus bring forth a better mix [of candidates] for Alaska.[83]

But again, neither of these interests—encouraging unaffiliated voters to join political parties and strengthening existing political parties—is at issue here. Strengthening political parties may, in the abstract, be an important government interest. But in the context of a primary system that already allows political parties to open their ballots not merely to unaffiliated voters, but also to registered members of other political parties, this interest is neither sufficiently concrete nor sufficiently compelling to support prohibiting mutually willing political parties from opening their ballots to each other. Similarly, the state's asserted interest in encouraging unaffiliated voters to become political party members cannot serve as a justification for prohibiting combined ballots in a primary system that already allows unaffiliated voters to vote in any political party's primary. By the same token, where the state's primary system allows political parties to open their primary ballots to registered members of other political parties—in other words, where the election code expressly allows "poaching" from other parties—the state's interest in protecting political parties from disorganization cannot support prohibiting willing political parties from sharing a primary ballot.

 The state's next argument is that prohibiting combined ballots furthers political stability by encouraging the two-party system. It is true that the Supreme Court has indicated that the federal constitution allows a state to "decide that political stability is best served through a healthy two-party system." [84] But Alaska has never recognized

---

**81.** *Munro*, 479 U.S. at 194, 107 S.Ct. 533; *Vogler I*, 651 P.2d at 4.

**82.** AS 15.60.010(23). A candidate may gain a spot on the general election ballot either by political party nomination (AS 15.25.010, .100) or by petition (AS 15.25.140, .160).

**83.** Minutes, House Judiciary Comm. (April 4, 2001).

**84.** *Timmons*, 520 U.S. at 367, 117 S.Ct. 1364.

the legitimacy of this interest. Yet even assuming that this interest is an important one in the abstract, we fail to see how allowing combined ballots poses any actual threat to the two-party system. It seems extremely unlikely that the opportunity to vote for candidates of two minor political parties on a single ballot might lure many members of the two major political parties away from those political parties. But if a combined ballot did have this effect, it would not justify state action: "Political competition that draws resources away from the major political parties cannot, for that reason alone, be condemned as 'unrestrained factionalism.' " [85] The mere fact that a minor political party's otherwise legitimate actions might make the political party more appealing to members of the major political parties is not sufficient reason to prohibit those actions: "States do not have a valid interest in manipulating the outcome of elections, in protecting the major parties from competition, or in stunting the growth of new parties." [86] Moreover, the major political parties are free to use combined ballots (provided that they can find political parties willing to combine with them) and so would be able to enjoy whatever advantages a combined ballot might offer to minor parties.

The state next argues that its interests in avoiding voter confusion and in ensuring an orderly and efficient primary process support the prohibition on combined ballots. As we have indicated, the bare assertion of an abstract interest is insufficient to support restricting constitutionally protected rights.

Here, the state fails to show that allowing combined ballots would threaten increased voter confusion. Although the state contends that "[t]he system demanded by the political parties contains the seeds of an elections procedure Babel," the state's worst case scenario does not demonstrate increased confusion. The state describes a scenario in which five political parties seeking to combine in a variety of ways could generate some nine different ballots. [87] But the state's calculations are mistaken: the scenario would actually require only five ballots—the same number of ballots there would be if political parties were prohibited from sharing ballots. [88] Moreover, given that Alaska's blanket primary system caused little apparent voter confusion, we see no basis for predicting that Alaska voters might be incapable of understanding combined ballots. The Supreme Court has expressed "faith in the ability of individual voters to inform themselves about campaign issues." [89] We are equally confident that Alaska voters would have little trouble understanding and choosing between combined ballots.

More important, even if combined ballots might prove confusing for voters, the fit between the state's means of addressing this problem—the prohibition on combined ballots-and the end-protecting the voters from confusion—is too attenuated to pass constitutional muster. Under the existing system five political parties would generate five ballots; each ballot might be open (1) only to political party members; (2) to political party

**85.** *Anderson,* 460 U.S. at 803, 103 S.Ct. 1564.

**86.** *Clingman,* 125 S.Ct. at 2048 (Stevens, J., dissenting).

**87.** The state's scenario is as follows: "Suppose that the Green Party decides that it will open its primary ballot to all other parties who wish to join it. The Republican Party decides that it will combine with the Green Party and the Alaska Independence Party. The Alaska Independence Party (AIP) decides that it will combine with the Republicans and Democrats, but, not with the Greens. The Democratic Party decides it will combine with the Green Party and the AIP party but not with the Republicans. The Libertarian Party decides it wants a separate party primary ballot. Under these circumstances there will be two Republican primary ballots for voters to choose from, a Republican/Green Party and a Republican/AIP. There will be two Green Party

ballots for voters to choose from, a Green Party/Republican, and a Green Party/Democratic. There will also be two AIP ballots for voters to choose from, an AIP/Republican, and an AIP/Democratic Party. There will be two Democratic Party ballots for voters to choose from, a Democratic/Green Party, and a Democratic/AIP. There will be one Libertarian Party primary ballot."

**88.** All but one of the ballots on the state's list appears twice. Under the state's scenario, there would in fact be five ballots. The ballots would be: (1) Republican/Green; (2) Republican/AIP; (3) Green/Democratic; (4) AIP/Democratic; and (5) Libertarian.

**89.** *Anderson,* 460 U.S. at 797, 103 S.Ct. 1564.

members and unaffiliated voters; or (3) to political party members, unaffiliated voters, and registered members of other political parties; and immediately before entering the voting booth, each voter would essentially be required to choose which ballot to vote. This system is no less confusing than a system that allows shared ballots. The prohibition on shared ballots is thus not closely related to the state's interest in avoiding voter confusion.

 The state also claims an interest in orderly and efficient primary elections. Although allowing combined ballots might prove to be more complicated administratively than single-party ballots, the state fails to explain how these additional complications might pose a serious threat to orderly or efficient elections. Moreover, even if combined ballots imposed a significant administrative burden, a state "can no more restrain [a party's] freedom of association for reasons of its own administrative convenience than it could on the same ground limit the ballot access of a new major party."[90] The state's desire to conduct orderly elections is therefore not a plausible explanation for the restrictions. In our view,"[w]hile States do have a valid interest in conducting orderly elections and in encouraging the maximum participation of voters, neither of these interests overrides (*or, indeed, even conflicts with* ) the valid interests of both [the parties] and the voters who wish to participate in [their] primary."[91]

In addition to the foregoing interests, the state relies on the Supreme Court's discussion in *American Party of Texas v. White*[92] of the interests that justified Texas's requirement that voters participate in the primary process of no more than one political party. The state insists that because the Court found permissible the state's primary scheme, which "confine[d] voters to support-

ing one party and its candidates in the course of the same nominating process,"[93] Alaska's prohibition on combined primary ballots is similarly permissible.

But in our view, *White* is distinguishable. In *White*, minority political parties, their candidates, and would-be independent candidates brought an action challenging the Texas Election Code's requirements for nominating candidates to the general election.[94] Under the Texas statutes, a political party whose candidates had "polled less than 2% of the total gubernatorial vote in the preceding general election" or that "did not nominate a candidate for governor" was required to hold a nominating convention and to show that it had the support of at least one percent of the total votes cast for governor in the previous election.[95] To demonstrate that it had the required quantum of support, the political party had to prepare a list of those who had participated in its convention. If those participants were fewer than the required one percent, the political party could circulate petitions seeking signatures sufficient to reach the one percent mark.[96] Those petitions could only be signed by qualified voters who had not participated in any other political party's primary or nominating convention.[97]

The plaintiffs challenged the restriction of eligible petition signers to those who had not participated in another political party's primary process.[98] They also challenged the requirement that they demonstrate the support of one percent of the voters.[99] The Court held that states could legitimately require a political party to show that it had "a significant, measurable quantum of community support" as a condition for placing the political party's nominee on the general election ballot.[100] Having so held, the Court had little difficulty concluding that limiting voters

---

**90.** *Tashjian,* 479 U.S. at 219, 107 S.Ct. 544.

**91.** *Clingman,* 125 S.Ct. at 2048 (Stevens, J., dissenting) (emphasis added).

**92.** 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974).

**93.** *Id.* at 786, 94 S.Ct. 1296.

**94.** *Id.* at 770, 94 S.Ct. 1296.

**95.** *Id.* at 774 & 774 n. 6, 94 S.Ct. 1296.

**96.** *Id.* at 774 n. 6, 94 S.Ct. 1296.

**97.** *Id.*

**98.** *Id.* at 779, 94 S.Ct. 1296.

**99.** *Id.*

**100.** *Id.* at 782, 94 S.Ct. 1296.

to participating in one nominating process did not violate the Constitution. This restriction ensured that the political party truly had the required quantum of support: it prohibited voters from endorsing more than one political party for the purposes of determining which parties would gain a place on the general election ballot. In addition, the Court observed, the restriction served to protect against double voting because it prohibited "any elector's casting more than one vote in the process of nominating candidates for a particular office."[101]

Neither of the dangers addressed in *White* exists in the context of Alaska's primary system. Allowing political parties to share a ballot would not make double voting—either for an office or to establish the needed quantum of support for a political party—possible under Alaska's primary system. As the Green and Republican Moderate parties point out, the combined ballot they seek would not allow a voter to vote for more than one candidate for any single office. Under the proposed combined ballot, although a voter would be able to vote for a Green Party candidate for governor and a Republican Moderate candidate for senator, only one vote could be cast for each office.

Neither would a combined ballot allow a voter to be counted in two different political parties' showing of community support. As we have already discussed, participation at the primary stage is not relevant under the current election code to a political party's demonstration that it has sufficient community support.[102] Permitting a voter to vote on a combined ballot would therefore not cause that voter to be counted in more than one political party's modicum of support. As applied to the present case, then, *White* does not support restricting voters to participating in a single primary.

## IV. CONCLUSION

 For these reasons, we conclude that prohibiting combined ballots places a heavy burden on the Green and Republican Moder-

ate parties' associational rights; most of the state's interests are too abstract to support that burden; and the remainder of the state's interests are not closely related to the prohibition on combined ballots. We thus hold that the prohibition on combined ballots violates article I, section 5 of the Alaska Constitution. We AFFIRM the superior court's judgment.

---

**101.** *Id.* at 785, 94 S.Ct. 1296.

**102.** The state in effect concedes as much when it disputes the Green and Republican Moderate parties' suggestion that the prohibition on combined ballots somehow caused them not to poll

the required three percent at the general election. The state insists, "no evidence in the record demonstrates any connection between the requirements of the primary election law and the political parties' loss of recognized party status."